## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Anthony Fry, being duly sworn, deposes and says that I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

Upon information and belief, from in and around February 2021 through current, within the Northern District of Ohio and elsewhere, the defendants, PAUL SPIVAK, together with others, conspired to commit an offense, that is securities fraud in that he knowingly and intentionally attempted to execute a scheme and artifice to defraud investors and potential investors in connection with US Lighting Group, Inc. to obtain money and property from investors and potential investors by means of materially false and fraudulent pretenses, representations, and promises in connection with purchases and sales of securities of issuers, specifically US Lighting Group, Inc. in violation of Title 15, United States Code, Sections 78j(b), 78ff, Title 17; Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 371.

In addition, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 371 have been committed by PAUL SPIVAK, and others, known and unknown.

The source of you affiant's information and the grounds for his belief are as follows:

## INTRODUCTION

1.      I have been a Special Agent with the FBI since September 2018. I am currently assigned to an FBI squad which investigates securities fraud, wire fraud, and other financial crimes. During my tenure with the FBI, I have participated in financial fraud investigations involving stock market manipulation and other illegal manipulative trading schemes. I have participated in all aspects of investigations including executing search warrants, debriefing

1

defendants and informants, interviewing witnesses, and reviewing and analyzing recorded interstate telephone conversations.

2.      I have personally participated in the investigation of securities fraud by PAUL SPIVAK, among others, as discussed below. I am familiar with the facts and circumstances of this investigation, through discussions with other law enforcement agents and undercover law enforcement agents involved in this investigation, and through my review of consensual recordings, interviews of witnesses and co-conspirators, federal grand jury subpoena returns, among other sources of evidence.

3.      Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to request the issuance of a federal criminal complaint, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause to support the issuance of a federal criminal complaint. In addition, where the contents of documents, or the actions, statements, and conversations of others are reported herein, they are reported in sum and substance in part except where otherwise indicated. Summaries of recorded interstate telephone conversations are based upon draft transcripts and summaries of these conversations, which are subject to revision.

## **PROBABLE CAUSE**

Relevant Regulatory Principles and Definitions

4.      The United States Securities and Exchange Commission, hereinafter referred to as the SEC, was an independent agency of the Unites States which was charged by law with

2

protecting investors by regulating, and monitoring, among other things the purchase, and sale of publicly traded securities, including securities traded on the United States based stock exchanges.

5.      Federal securities law, and regulations prohibited fraud in connection with the purchase, and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms, and transfer agents involved in the purchase, and sale of stock in companies subject to SEC regulation; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

6.      Title 15, United States Code, Section 78j(b) makes it a federal offense for any person directly, or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of a national securities exchange, to use or employ, in connection with the purchase or sale of any security registered on a national exchange, any manipulative, or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest of for the protection of investors, including: (a) employing devices, scheme, and artifices to defraud; (b) making untrue statements of fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated as a fraud upon investors, in connection with the purchase and sale of the securities. Failure to disclose to investors commission payments from third parties, including payments from issuers, was considered an omission of a material a fact as part of a securities transaction.

7.      Title 18, United States Code, Section 371 (Conspiracy to commit securities fraud) two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

8.      An over-the-counter market ("OTC") is a decentralized market in which market participants trade stocks, commodities, currencies, or other instruments directly between two parties and without a central exchange or broker. OTC markets do not have physical locations, but instead trading is conducted electronically. In an OTC market, dealers act as market-makers by quoting prices at which they will buy and sell a security, currency, or other financial product. A trade can be executed between two parties in an OTC market without others being aware of the price at which the securities transaction was completed. OTC markets are typically less transparent than exchanges and are also subject to fewer regulations.

9.      "Microcap" or "penny" stocks referred to stocks of publicly traded United States companies which had low market capitalization. Microcap stocks were subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that were traded on notable exchanges such as the National Association of Securities Dealers Automated Quotes ("NASDAQ"), and the New York Stock Exchange ("NYSE").  The NASDAQ, and NYSE had specific standards that were monitored and enforced for a company to have its stock traded on those exchanges. Additionally, large blocks of these type of stocks were often controlled by a small group of individuals, which enabled those in the group to control and orchestrate manipulative trading in those stocks.

Market Manipulation Schemes

10.     A pump and dump scheme was a securities fraud scheme that typically involved the artificial inflation of the stock price of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell shares of that stock at artificially high prices to other investors (the "dump") in the open market. Generally, pump and dump schemes effected the artificial inflation in stock share price by, among other things, issuing new releases, and promotional materials regarding the company, and its stock. These press releases often contain false, misleading, or exaggerated information, and are timed for the greatest enrichment of the individuals who control a substantial portion of the company's stock. In addition, pump and dump schemes engage in manipulative trading of the stock to affect its share price and generate the appearance of demand for the stock shares.

11.     As a result of a pump and dump independent third-party purchasers were subsequently left with a near worthless security when the price dropped to accurately reflect the stocks true value, or lack thereof, in the open market. There were generally three phases to a pump and dump scheme; (a) first, obtaining and concealing control of a significant portion of a publicly traded company's stock, (b) second, fraudulently inflating or keeping inflated the price, and trading volume of the company's stock through a variety of means, and (c) third, once the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby, profiting at the expense of the investing public.

Rule 144 Schemes

12.     Federal statutes and regulations generally prohibit a company or its affiliates from selling shares of stock to the investing public unless the company makes public disclosures about

5

its ownership, management, finances and operations. Such disclosures usually are made by filing a registration statement with the SEC for a particular stock distribution.

13.     There are, however, exemptions from the registration requirements. One exemption involves the distribution of stock pursuant to Rule 144 under the Securities Act of 1933. As long as a person is not an affiliate of the company or its management, and has cleared various technical hurdles, that person may legally sell the stock under Rule 144. In contrast, an affiliate, defined as a person who "directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control" with those who manage the company, is subject to additional restrictions. Relevant to Rule 144, affiliates are allowed to sell shares to the public only if they meet a number of requirements, including (1) filing disclosures with the SEC (on SEC Form 144) regarding the sales, and (2) staying within strict share volume limitations. The volume limitations restrict a person's sales under Rule 144 during any three-month period to (a) 1% of the total number of outstanding shares, or (b) the average weekly trading volume for the preceding four weeks, whichever is greater.

14.     I also know through my training and experience, and through consultation with other agents, investigators, and regulators, that fraudulent schemes to evade these restrictions are common. This is particularly true with respect to the stock of microcap companies. In such schemes, an individual who is a known affiliate of a microcap company (the "Insider," e.g., the company's CEO, CFO, or member of its board of directors) enters into a secret agreement with another individual who has access to a brokerage account (the "Seller"). Under such an agreement, the Insider transfers or issues stock (or a security that can be converted into stock) to the Seller. The Seller then attempts to deposit the stock at his or her brokerage firm. Under applicable securities regulations, brokerage firms have a duty of reasonable inquiry to determine

6

whether a client's (in this example, the Seller's) offering of stock to the public is registered with the SEC or an exemption applies.

15.     If the Seller is successful in convincing the brokerage firm that an exemption from the registration requirement applies, the Seller sells the stock to the public, and kicks back a portion of the proceeds to the Insider. This secret agreement, if known, would support a finding that the Seller is him or herself an "affiliate," and therefore could only sell a limited quantity of shares to the public. The affiliate and the Insider therefore often misrepresent the facts surrounding the arrangement to, and hide the secret agreement from, the Seller's brokerage firm.

Defendants, Relevant Persons, Entities, and Financial Accounts

16.     PAUL SPIVAK was a resident of Willoughby Hills, Ohio.

17.     US LIGHTING GROUP, INC., ("USLG"), was a publicly traded Florida corporation, and was registered on or about October 17, 2003, with its principal place of business in Euclid, Ohio. SPIVAK was the Chief Executive Officer of USLG. USLG's purported business operations were focused on the design and manufacturing of commercial LED lights, aftermarket automotive parts, and the design and manufacturing of fiberglass recreational campers and boats. US LIGHTING GROUP, INC. traded on OTC Markets under the ticker USLG.

18.     On or about July 1, 2014, SPIVAK opened bank account x5187 in the name of US Lighting Group at Huntington National Bank. SPIVAK was listed as the President, Owner, and CEO of USLG. On or about May 31, 2018, Individual 1 was added as an authorized signatory on the account and listed as the CFO of USLG.

19.     Co-Conspirator 1 was a resident of Willoughby Hills, Ohio.

20.     Co-Conspirator 2 was a resident of Alexandria, Virginia.

21.     Co-Conspirator 3 was a resident of Haleyville, Alabama.

22.     On or about March 1, 2018, Co-Conspirator 3, and Co-Conspirator 3's spouse, opened a joint checking account x2853 in the name of themselves at Bank of America. On or about October 26, 2016, Co-Conspirator 3 opened brokerage account x7D77 at Merrill Lynch, Pierce, Fenner & Smith, Inc, in the name of himself.

The Fraudulent Scheme

23.     Based on my participation in this investigation, I believe SPIVAK conspired with Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 to commit securities fraud (15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5) in violation 18 U.S.C. § 371, in the Northern District of Ohio, Eastern Division.  The investigation revealed that SPIVAK utilized nominees to conceal his beneficial ownership in free trading shares held in the name of Co-Conspirator 2 and Co-Conspirator 3 in violation of securities laws. SPIVAK failed to disclose his beneficial ownership, influence and control of the shares owned by Co-Conspirator 2 and Co-Conspirator 3 to the investing public and the SEC.  Moreover, SPIVAK knowingly utilized the sale of free-trading shares to raise operating capital for USLG.

24.     SPIVAK conspired to have FBI Undercover Employees ("UCEs") actively promote USLG's stock by coordinating the issuance of press releases by USLG with a planned promotional program. SPIVAK engaged in the scheme in in hopes of raising the share price and trading volume in USLG's stock and for personal enrichment. During the course of the scheme, SPIVAK arranged the sale of free-trading shares from nominees to the UCEs for the purpose of the market manipulation scheme.

25.     On or about February 15, 2021, Undercover Employee-1, ("UCE-1"), and a cooperating witness ("CW-1")[1] had a consensually recorded in-person meeting with SPIVAK and Co-Conspirator 1 in the Fort Lauderdale, Florida area. UCE-1 portrayed an investor. During the meeting SPIVAK described a scheme where UCE-1, CW-1, and their associates, purchase shares of USLG, sell the shares and use the money to purchase more shares from USLG. SPIVAK stated "what you are supposed to do, is sell it, buy more stock and we keep going in a circle like that."  Regarding a scenario where UCE-1 and CW-1 purchase stock directly from SPIVAK and that Company for $0.50 per share and sell the shares for $1.00 per share and then buy more shares for $0.50 per share, SPIVAK responded "yes, yes, yes, that is what everybody has been doing." SPIVAK added "that's how we make a bunch of money" and that by doing this, SPIVAK has a never-ending supply of money coming into the company.

26.     On or about February 16, 2021, CW-1 had a consensually recorded in-person meeting with SPIVAK, and Co-Conspirator 1. SPIVAK told CW-1 that all the convertible notes had been converted in USLG except for one. SPIVAK stated if CW-1 purchased the note from the investor that held the note, SPIVAK could issue a press releases stating all the notes had been converted. SPIVAK told CW-1 that during the previous scheme he executed to manipulate the stock USLG's stock price went up to $1.50 per share. SPIVAK described his previous partner as a "professional pump and dumper."

---

[1] CW-1 was previously charged and convicted of securities fraud and agreed to cooperate with law enforcement in hopes of reducing his sentence pursuant to U.S.S.G. § 5K1.1.  After serving their sentence, CW-1 continued to cooperate with law enforcement. I believe CW-1 was and is a reliable and credible source of information as the information CW-1 provided has been corroborated by independent investigation.

27.    On or about March 5, 2021, Undercover Employee-2 ("UCE-2"), and CW-1 had a consensually recorded in-person meeting with SPIVAK, and Co-Conspirator 1 at USLG's office in the Northern District of Ohio, Eastern Division. UCE-2 portrayed a wealthy investor interested in purchasing shares of USLG. During the meeting SPIVAK told Co-Conspirator 1 to "go in and grab the top-secret document and bring it in here." SPIVAK stated he would tell UCE-2 and CW-1 how they were going to make money with the stock, and that SPIVAK was happy there was not many people in the room for the conversation. SPIVAK showed UCE-2 and CW-1 a copy of the most current financial statements which were not available to the public yet. SPIVAK told CW-1 and UCE-2 that he had two individuals who were "very trusted friends" and held approximately 3 million USLG shares each. SPIVAK stated the plan was, once the stock price rose, the two individuals would sell off the stock and buy more stock from the company. SPIVAK stated the two individuals would not sell the stock for $0.15 per share and the purchase price would likely be higher than the open market price. SPIVAK stated the shares were technically company stock, but if the company owned the stock, it would no longer be free-trading shares. Co-Conspirator 1 stated one individual was in Virginia, and the other was in Alabama. SPIVAK stated there was very little stock in the float and it would not take much to get the stock price to "go very high".  I know from my training and experience that the "float", is the number of shares publicly available in the market for investors to trade in a stock and that SPIVAK was telling UCE-2 and CW-1 given the small size  of stock available for the public to trade in USLG made it easier for SPIVAK, UCE-2 and CW-1 to manipulate USLG's share price.

28.    On or about March 10, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. SPIVAK and CW-1 agreed to start with a $25,000 transaction as a "test" with each of SPIVAK's "trusted guys", and to later negotiate the purchase the remainder of the six

million shares. SPIVAK told CW-1 that SPIVAK needed to call his co-conspirators and inform them CW-1 was "on the team" and not an "outsider" prior to negotiating the share purchases. Later that day, SPIVAK called CW-1 and stated he would text CW-1 the contact information for Co-Conspirator 2 and that Co-Conspirator 2 was awaiting CW-1's call regarding purchasing shares of USLG. Co-Conspirator 2 also controlled another publicly traded company that SPIVAK gave to Co-Conspirator 2. SPIVAK stated after they made a bunch of money on USLG's stock they could move to Co-Conspirator 2's public company.

29. On or about March 10, 2021, CW-1 had a consensually recorded telephone call with Co-Conspirator 2. Co-Conspirator 2 told CW-1 that Co-Conspirator 2 had approximately 3,500,000 shares of USLG and was willing to sell the shares.

30. On or about March 15, 2021, CW-1 had a consensually recorded telephone call with Co-Conspirator 3. Co-Conspirator 3 told CW-1 that the arrangement Co-Conspirator 3 maintained with SPIVAK worked out "fairly well for [SPIVAK]" and had not "totally sucked" for Co-Conspirator 3. Co-Conspirator 3 told CW-1 that he had approximately $200,000 currently invested in USLG, owned approximately 1,800,000 USLG shares in certificate form, book form at the transfer agent and in several brokerage accounts controlled by Co-Conspirator 3.

31. On or about March 16, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. SPIVAK told CW-1 that Co-Conspirator 2 did not sign the stock purchase agreement because the agreement showed $0.25 per share for the sale and not $0.30 per share. SPIVAK stated that Co-Conspirator 2 and Co-Conspirator 3 were "holding onto the stock for me" or holding the stock for the company. SPIVAK stated that prior to CW-1's involvement, Co-Conspirator 2 and Co-Conspirator 3 were going to run a promotion with USLG after the audited financial statements were completed. SPIVAK stated that Co-Conspirator 2 and Co-

Conspirator 3 "basically got the stock for free" so they would have to pay tax on the entire $0.30 per share, and then send SPIVAK $0.15 per share. SPIVAK stated he trusted Co-Conspirator 2 and Co-Conspirator 3 like family, and that was why Co-Conspirator 2 and Co-Conspirator 3 were "holding on to the corporate, free-trading stock."

32.     On or about March 16, 2021, CW-1 had a consensually recorded telephone call with Co-Conspirator 2. During the call, Co-Conspirator 2 agreed to sign and return a stock purchase agreement to sell a block of 100,000 free-trading shares of USLG to UCE-2 for $0.25 per share.

33.     On or about March 24, 2021, CW-1 had a consensually recorded telephone call with Co-Conspirator 3. During the call, Co-Conspirator 3 stated that he expressed concern to SPIVAK that after Co-Conspirator 3 received the $25,000 from CW-1, and paid SPIVAK $15,000 and taxes on the stock sale, Co-Conspirator 3 was not even going to clear $10,000. Co-Conspirator 3 stated that the original deal with SPIVAK was that Co-Conspirator 3 and Co-Conspirator 2 would receive their original $50,000 investments back before sending money to SPIVAK, but that did not happen.

34.     On or about March 26, 2021, the FBI sent an interstate wire transfer of $25,000 from an FBI controlled bank account to Co-Conspirator 3's Bank of America account ending in x2853 in the name of Co-Conspirator 3 which was located in Haleyville, Alabama for the purchase of 100,000 free-trading shares of USLG.

35.     On or about March 30, 2021, UCE-2 and CW-1 had a consensually recorded in person meeting with SPIVAK in Cleveland, Ohio. During the consensually recorded in person meeting with SPIVAK, UCE-2 and CW-1 initiated a Zoom call with Undercover Employee-3 ("UCE-3"). UCE-3 portrayed a stock promoter. SPIVAK stated there is approximately 6 million

shares of USLG in "very friendly hands," and further discussed running a promotion to increase USLG's stock price. SPIVAK told CW-1 and UCE-2 that Co-Conspirator 2 and Co-Conspirator 3 considered running a promotion before with USLG and that Co-Conspirator 2 and Co-Conspirator 3 would do whatever SPIVAK says because "they're very trusted guys." SPIVAK went on to say that was why Co-Conspirator 2 and Co-Conspirator 3 were the "friendly hands" holding onto the stock in order to prevent the stock from becoming restricted.

36.     On or about April 1, 2021, the FBI sent an interstate wire transfer of $25,000 from an FBI controlled bank account to Co-Conspirator 2's Navy Federal Credit Union account ending in x4974 for the purchase of 100,000 free-trading shares of USLG.

37.     On or about April 2, 2021, Co-Conspirator 3 sent a $15,000.00 wire transfer from Co-Conspirator 3 controlled account x2853 at Bank of America to USLG Huntington account x5187.

38.     On or about April 13, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. SPIVAK told CW-1 that SPIVAK could not wait around anymore and that he had "perfectly good press releases that are being wasted." SPIVAK stated he was starting a marketing campaign that week. SPIVAK was going to call "the guys" and ask why they had not sent the stock certificates to CW-1.

39.     On or about April 15, 2021, CW-1 had a consensually recorded telephone call with Co-Conspirator 3. Co-Conspirator 3 stated he had transferred the share to CW-1 at the transfer agent in book form. Co-Conspirator 3 stated he had moved an additional 800,000 share to book form at the transfer agent to sell to CW-1 and CW-1's associates in the future.

40.     On or about April 19, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. During the call, SPIVAK asked for a target date for when the promotion was

13

going to start on USLG. SPIVAK described himself as the "press release king" and asked CW-1 to ask UCE-1 how many press releases UCE-1 wants and by what date. SPIVAK asked CW-1 to have UCE-1 call SPIVAK to discuss the timing of the promotion and press releases.

41.     On or about April 22, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. SPIVAK told CW-1 that SPIVAK only had access to restricted shares to provide to UCE-2. Regarding the possibility of issuing consulting shares to UCE-2, SPIVAK stated "I'm sure we can work something out." SPIVAK told CW-1 not to email SPIVAK or put anything in writing.

42.     On or about May 7, 2021, CW-1 had a consensually recorded telephone call with SPIVAK. SPIVAK confirmed with CW-1 that the promotion of USLG would begin in June.

43.     On or about May 18, 2021, CW-1 had a consensually recorded in-person meeting with SPIVAK at USLG's office. While discussing USLG's projected share price, SPIVAK told CW-1 that everything he and CW-1 were discussing was "only with you and I (SPIVAK) in the room." Later in the meeting, SPIVAK told CW-1 that they needed to come up with a plan and that SPIVAK would compensate CW-1 "for when X happens... and nobody f**king knows about it, not even my wife." As SPIVAK started to formalize a plan to compensate CW-1, SPIVAK directed CW-1 to take a walk with him outside and to leave his cell phone in the office so their conversation could not be recorded. As SPIVAK and CW-1 departed USLG's office, SPIVAK asked CW-1 what percentage of the 6 million shares CW-1 wanted as compensation. SPIVAK told CW-1 that he would have to give it to CW-1 "as a consultant." SPIVAK further stated, "I will give you 1.5 million shares if they (UCE-2 and UCE-3) buy them (Co-Conspirator 2 and Co-Conspirator 3) out completely." SPIVAK and CW-1 continued to discuss a plan to

compensate CW-1 and agreed to draft up a consulting agreement between USLG and a name of a to-be-determined consulting company.

44.     On the same date, during the consensually recorded in-person meeting with SPIVAK, SPIVAK raised coming up with a cover story if SPIVAK and CW-1 were questioned by authorities. SPIVAK told CW-1 that they should assume they would "get busted," and asked CW-1 what they would say "when they get busted." SPIVAK told CW-1 that if they assumed they were going to get caught, then when they did, it would not be a problem. SPIVAK asked CW-1 if he had an iPhone and instructed CW-1 to FaceTime him if CW-1 "needed to tell me (SPIVAK) something" because "you can't listen in." SPIVAK subsequently stated that what he and CW-1 were doing was "against SEC rules." SPIVAK further discussed CW-1's compensation being through a consulting agreement between USLG and CW-1. The discussion between CW-1 and SPIVAK ended by way of a handshake agreement.

45.     Based on my training, experience, and discussions with other law enforcement agents, between February 15, 2021 and June 7, 2021, SPIVAK, conspired with Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 to engage in securities fraud in violation of 18 U.S.C. § 371.

## CONCLUSION

46.     Based on the totality of the facts and circumstances set forth herein, and based upon my training and experience, there is probable cause to believe, and I do believe, PAUL SPIVAK engaged in conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5. Accordingly, I respectfully request that the Court issue a Federal Criminal Complaint authorizing the arrest of PAUL SPIVAK.

## <u>REQUEST TO SEAL THIS AFFIDAVIT</u>

47.     Finally, in my judgement and based on my training and experience, as well as conversations with other law enforcement agents, it is my belief that the disclosure of this affidavit, at this time, will jeopardize the governments ongoing investigation, and ability to arrest PAUL SPIVAK in the Northern District of Ohio and elsewhere. Accordingly, it is requested that this affidavit and arrest warrant be sealed until further order of the Court.


_____
Special Agent Anthony Fry
Federal Bureau of Investigation


Sworn to via telephone after submission by reliable electronic means. Fed. R. Crim. P. 4.1 and 41(d)(3) this 7th day of June, 2021.

_____
Jonathan D. Greenberg
United States Magistrate Judge

16